## KANSAS CITY, M. & O. RY. CO. v. ROE.

No. 8966—Opinion Filed April 15, 1919.

(180 Pac. 371.)

(Syllabus.)

**1. Master and Servant—Injuries to Servant—Safe Place to Work.**

It is the duty of a railway company to make and keep its roadbed and tracks in a reasonably safe condition, and if it permits same to become and remain out of repair, and as a result thereof an accident is caused, resulting in injury to an employe, the company will be liable.

**2. Same—Assumption of Risk—Statutes.**

Under the federal Employers' Liability Act (Comp. Stat. of U. S. secs. 8657-8665), the law of assumption of risk is that of the common law as it existed prior to the passage of said act, except where the common carrier has violated some statute enacted for the safety of employes.

**3. Same—Question of Fact and Law.**

On the issue of assumption of risk by a servant who has sustained injuries, where the evidence is harmonious and consistent, and the circumstances are such that all reasonable men must reach the same conclusion, the question whether the plaintiff assumed the risk is one of law for the determination of the court; but where the facts are controverted, or are such that different inferences may be drawn therefrom, the question as to the assumption of the risk should be submitted to the jury under proper instructions from the court.

**4. Same—Assumption of Risk.**

Under the federal Employers' Liability Act (Act of April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. Stat. §§ 8657-8665]), the servant assumes all the ordinary risks of his employment which are known to him, or which could have been known by the exercise of ordinary care to a person of reasonable prudence and diligence in like circumstances. Risks not naturally incident to the occupation, but which arise from the negligence of the master, are not assumed by the servant until he becomes aware of such negligence, and of the risks arising therefrom, unless the negligence and risk are so apparent and obvious that an ordinary and careful person would observe the one and appreciate the other.

**5. Same—Evidence—Sufficiency.**

Evidence examined, and held, that under the facts of this case the question of assumption of risk was properly submitted to the jury.

**6. Evidence—Admissibility — Depositions— Necessity of Filing of Stenographic Notes.**

Where not otherwise objectionable, testimony of witnesses adduced at a former trial between the same parties, involving the same subject-matter, which has been transcribed by the court reporter from his stenographic notes and certified to by him, incorporated in the case-made, the case-made signed and settled by the trial judge, and the same filed with the clerk of the district court, is admissible in evidence as the deposition of said witnesses, although the reporter's notes were not filed in the district court, as provided by section 1792, Rev. Laws of 1910.

Error from District Court, Major County; J. C. Robberts, Judge.

Action by A. A. Roe, as administrator of C. W. Rue, deceased, against the Kansas City, Mexico & Orient Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

D. W. Eaton, H. J. Eaton, and Burford, Robertson, Hoffman & Burford, for plaintiff in error.

E. C. Wilcox and Harry Randall, for defendant in error.

RAINEY, J. This action was instituted in the district court of Major county, Okla., by A. A. Roe, as administrator of the estate of C. W. Rue, deceased, against the defendant, Kansas City, Mexico & Orient Railway Company, for damages for the death of C. W. Rue, which was caused by one of defendant company's switch engines on which the deceased was riding, turning over and so severely scalding the said C. W. Rue that he died shortly thereafter.

The cause was tried to a jury resulting in a verdict for the plaintiff in the sum of $15,300. Necessary steps were taken by the defendant company to perfect the appeal, and the case is now here for review. For convenience the parties will be designated plaintiff and defendant, according to their respective titles in the trial court.

The deceased, C. W. Rue, was the foreman of a switching crew in the yards of the defendant company at Altus, Okla.; said crew consisting of himself, J. A. Trumbo, J. W. Barker, and Michail H. Phelan, who were foreman, engineer, fireman, and switch-

man, respectively. This crew had been using a new switch engine, No. 20, for about three weeks, which, prior to the 17th day of December, 1909, had been used exclusively in the yards at Altus, with the exception of one trip to Chillicothe, Tex., where it had been used by the same crew to haul a train; the number of cars and tonnage hauled on said trip not appearing in the record. On said date this crew, under the directions of the railway company, took the engine to Clinton, Okla., for the purpose of having it washed and cleaned out. The track from Altus to Clinton, as will hereinafter more fully appear, was in bad condition, and before starting on the run the crew was given both a running order and a slow order; the latter being as follows:

"Very bad place for one mile east from yard limit board Altus and between Altus and Blair look out for water crane at bridge 135 about six and half miles east of Altus from mile board west of Lone Wolf to first bridge west and one-half mile west of Lone Wolf west end house track switch Lone Wolf spiked acct taking rail out of side track reduce speed to six miles per hour from bridge 119 one and quarter miles west of Cambridge to bridge 117 two and half miles east of Cambridge in cut one and half miles west of Sentinel at first bridge east of Sentinel on west and curve 2 and three quarter mile east of Sentinel very rough places between bridge 104 and Braithwaite reduce speed to four miles per hour from bridge 101 to bridge 103 west of Clinton run slow and carefully at derailment at bridge 102 west of Clinton reduce speed to six miles per hour six telegraph poles west of west yard limit board Clinton."

The trip to Clinton was made without mishap, and, when the crew was ready to return to Altus on the afternoon of the following day, they received a running order from the superintendent of the road, but did not receive a slow order. They were also directed to take a car of water and nine cars of coal back to Altus with this engine. On this return trip, a point between Bridge 104 and Braithwaite, there was a derailment causing the engine to turn over and resulting in the injuries and death aforesaid of the deceased. Barker and Trumbo were also injured. At the point of derailment there was a grade around a curve and the train was going down the grade at the rate of from 8 to 10 miles per hour. The engine weighed about 140,000 pounds and had a capacity for hauling about 600 tons. It did not have any pilot or pony trucks, as it was designed for switching purposes. According to the witnesses, the advantage of a pilot on an en-

gine is that when it strikes rock, dirt, or any other' substance, it throws it to one side and prevents it from going under the engine and being run over, and pony trucks on an engine are provided for the purpose of guiding and helping to carry the weight and thus keeping it on the track. Where the derailment occurred, the track was not ballasted, was very rough and uneven, the ties resting on the ground, which was a red gumbo dirt. The fill was narrow, being just a little wider than the ties; the weather was quite cold; the ground was wet, and there was about an inch of snow on it. Some of the ties were rotten, and some broken. The track was not only bad here, but was bad for quite a distance, as appears from the testimony and is indicated by the slow order. The roadbed was surfaced with such dirt as existed in the locality where the track was constructed, and was not ballasted anywhere on this division.

The negligence charged was that the engine was not designed for hauling trains over the road, and was an improper engine for such purposes on account of being too light and not being properly equipped for hauling a train; that the roadbed between said stations of Clinton and Altus was in most places out of repair, had broken and rotten ties, and was not properly ballasted, in that there was no stone and gravel or other heavy substance placed between said ties; that the earth was washed away from the ties and from the ends and sides thereof, so that said ties, by the weight of the engine, would slip around on the roadbed; that said roadbed was too narrow and not filled in with the class or kind of dirt or substance that would hold the ties, and the rains and weather had worn the roadbed away and made large ravines in it; and that said roadbed had remained in such condition for a long time.

There are only two propositions of law argued in defendant's brief. The first is that the deceased, Rue, assumed the risk of being injured on the occasion of the accident, and therefore plaintiff could not recover. The second relates to the admission of evidence, and will hereinafter be considered.

It is claimed by plaintiff, and is conceded by defendant, that Texas was the ultimate destination of the cars being hauled by the switch engine on the return trip from Clinton to Altus; that both the deceased and the defendant railway company were engaged in interstate commerce; and that the case is controlled by the federal Employers' Liabil-

ity Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. §§ 8657-8665]). Therefore, it is agreed by counsel that the provisions of section 6, art. 23, (355) of Williams' Annotated Constitution, making the defense of assumption of risk in all cases whatsoever a question of fact for the jury, are not applicable to this case. Chicago, R. I. & P. Ry. Co. v. Jackson, 61 Okla. 146, 160 Pac. 736; St. Louis & S. F. Ry. Co. v. Snowden, 48 Okla. 115, 149 Pac. 1083.

The law applicable to the defense of assumption of risk, under the federal Employers' Liability Act, is that of the common law as it existed prior to the passage of said act, except where the common carrier has violated some section of the statute enacted for the safety of employes. Since plaintiff does not contend that the evidence in this case shows there has been any violation of any such statute, the defense of assumption of risk, as it existed at common law, is open to the defendant.

On the issue of assumption of risk by a servant who has sustained injuries where the evidence is harmonious and consistent and the circumstances are such that all reasonable men must reach the same conclusion, the question whether the plaintiff assumed the risk is one of law for the determination of the court; but, where the facts are controverted or are such that different inferences may be drawn therefrom, the question as to the assumption of the risk should be submitted to the jury under proper instructions from the court.

Counsel for the defendant company, in their brief, say that the charge of the court is admirable and they have no criticism of it, but insist that had the court applied its charge to the facts as shown by the evidence, that defendant's demurrer to the plaintiff's evidence would have been sustained. This high praise of the court's instructions is well merited, and the question of assumption of risk was properly submitted to the jury, unless we can say, after an examination of all the plaintiff's evidence, that the facts are undisputed and consistent and present a situation so plain that reasonable men would not draw different conclusions therefrom, 26 Cyc. 1479; 18 Ruling Case Law, § 166, p. 676 (cases are cited in footnotes to the texts).

The rule in the United States courts is that a servant assumes all the ordinary risks of his employment which are known to him, or which could have been known to him, or which could have been known with the exercise of ordinary care by a person of

reasonable prudence and diligence under like circumstances, and that risks which are not naturally incident to the servant's occupation, but which arise from the negligence of the master, are not assumed by the servant until he becomes aware of such negligence and of the danger arising therefrom, unless the negligence and risks are so apparent and obvious that an ordinarily prudent person would, under the circumstances, observe the one and appreciate the other. Chicago, Rock Island & Pac. Ry. Co. v. Ward, 68 Okla. 201, 173 Pac. 212; Chicago, R. I. & P. Ry. Co. v. Hughes, 64 Okla. 74, 166 Pac. 411; Dickinson, Rec'r, v. Granbery, Adm'r, 71 Okla. 9, 174 Pac. 776; Gila Valley, G. & N. Ry. Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 231, 58 L. Ed. 521; Seaboard A. L. Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Missouri, O. & G. Ry. Co. v. Overmyre, 58 Okla. 723, 160 Pac. 933.

The undisputed evidence in this case is that the defendant company's roadbed was in a bad state of repair, which created an extraordinary risk attributable to the negligence of the company. The derailment was caused by hauling a train with a switch engine without pony trucks and a pilot on a rough, uneven, and insecure track. This is not only not disputed by the defendant company, but is relied upon by it to support its contention that this condition was so well known as to be a matter of common knowledge; that it was known to the deceased, or was so apparent that he was chargeable with knowledge of it; and that he, in carrying on the company's business, rode upon its engine to Clinton and the return trip to Altus without objection; that the slow order heretofore set out, a copy of which he and the engineer, Trumbo, received before starting upon the trip, called his attention to a great many unsafe places upon the line he was compelled to go over to Clinton; and that his attention was particularly called by said order to the rough places between Bridge 104 and Braithwaite. It is further contended that the deceased, Rue, Engineer Trumbo, and the other members of the switching crew, knew the condition of the track, and that they are charged with knowledge that it was impossible for the railway company to have repaired all the unsafe places between the time the deceased passed over the track to Clinton and the time of the derailment on the return trip. Defendant also says that Rue did not have a right to assume that the track had been repaired, for the reason that the surface of the snow had not been disturbed, which would have been the case if repairs

had been made between the time he went over and the return trip; that the deceased knew, as shown by the evidence, the number of men employed by the defendant company to keep up the track; and that it was impossible for all the dangerous conditions mentioned by the slow order to have been repaired in the intervening time. Counsel then draw the conclusion that a derailment might have been expected with the kind of engine he was on, and that the deceased and every one else knows that when an engine is derailed that it is apt to result in great injuries to the persons riding thereon. They say:

"That Rue, as a railroad man, could have had any idea that the engine could have been derailed with safety to himself is too preposterous for credence. That he knew that the derailment of the engine was liable to cause him an injury is only ascribing to him the wit and intelligence of the variest tyro, and makes it unnecessary to consider his long railroad experience, which can have had no other effect than to bring home to him a full realization and appreciation of the danger.

"Can it be said that any reasonable mind might dissent from the assertion that a person of ordinary and reasonable intelligence did realize and appreciate danger from the derailment of a railway locomotive upon which he was riding? We think not, and we assert that here again is no opportunity for reasonable minds to differ. The inevitable conclusion is that Rue realized and appreciated the danger of the conditions which had been brought to his notice and were within his knowledge."

The argument is not sound. Of course, the deceased was charged with knowledge of the kind of engine on which he was working, and that a derailment of it would probably result in some injuries to him, and the evidence discloses, as above stated, beyond controversy, that the roadbed was so rough and uneven as to make it prudent to proceed thereon slowly and with caution; but it cannot be said that, merely because the deceased and the engineer on the switch engine had a slow order on the trip to Clinton, this fact imputed to the deceased knowledge that there were rotten and broken ties and other defective conditions under the snow. True it is that he was an experienced railroad man and some time previous was on a run between Fairview and Altus, which included that part of the road where the accident occurred. The evidence, however, does not disclose how often nor how long previous to the day before the accident it had been since Rue had been over the road, or what condition it was in at the time he made such

trips over it, how many trips he had made, and what his opportunities were for observing the condition of the roadbed; but it does show that he had been working continuously in the yards at Altus for at least three weeks prior to the time he was directed to take the engine to Clinton on December 17th. It seems to us that, when the train crew was directed to take the engine to Clinton and were given a slow order by their superiors, Rue and the other members of the crew had the right to assume that, although the track was in bad condition in the places indicated by the order, by complying with the order they could make the trip with safety and without any more hazard than is ordinarily incident to making a trip over a good roadbed at the customary rate of speed. We think reasonable men would be of this opinion; at least, the jury had the right to so infer from the evidence. Certainly the officials of the railway company did not believe that a derailment was to be expected or they would not have directed the crew to make the trip with the switch engine, even with the slow order. That part of the slow order that applied to the stretch of the track where the accident occurred reads, "Very rough places between Bridge 104 and Braithwaite," and, according to the witnesses, the order did not designate the rate of speed which should not be exceeded between these points.

There is also evidence in the record from experienced railroad men that, when an order is given on one trip, it spends its force when the trip is completed, and, if they are directed to return over the same route without the order being renewed or another order given, they have a right to assume that the bad places have been repaired; but notwithstanding the fact that they did not have a slow order, the engineer, Trumbo, testified that he was proceeding slowly over the place of the accident, and, as he thought, with perfect safety. It is well settled that a railway company is liable to an employe for an injury to said employe proximately resulting from the negligence of the railway company in permitting its tracks to get out of repair and to remain in an unsafe condition. Ferris et al. v. Shandy, 71 Okla. 35, 174 Pac. 1060; K. C., Ft. Scott & Gulf Ry. Co. v. Kier. 41 Kan. 661, 671, 21 Pac. 770, 13 Am. St. Rep. 311; Krogg v. Atlanta & West Point Ry. Co., 77 Ga. 202, 4 Am. St. Rep. 79; Taylor, Bastrop & Houston Ry. Co. v. Taylor, 79 Tex. 104, 14 S. W. 918, 23 Am. St. Rep. 316; Swadley v. Mo. Pac. Ry. Co., 118 Mo. 268, 24 S. W. 140, 40 Am. St. Rep. 366; Fuller v. Tremont Lum-

ber Co., 114 La. 266, 38 South. 164, 108 Am. St. Rep. 348; Meloy v. C. & N. W. Ry. Co., 77 Iowa, 743, 42 N. W. 563, 4 L. R. A. 287, 14 Am. St. Rep. 325.

It was not claimed that it was the duty of the deceased to repair the track or assist therein, and there is not any evidence that he had, neither is there any evidence in the record that he had ever been over the road with a switch engine used to haul a train, as it was on this occasion, prior to this trip, and, as there was no caboose on the train, he was riding in the cab of the engine, as was proper and customary under such circumstances. The jury may well have concluded that he did not appreciate the danger of using the switch engine to haul a train on the rough and uneven track as it was being used at the time of the accident. Moreover, under the law, the defects of the track due to the defendant's negligence must not only have been known to the deceased, or to have been so obvious that he is presumed to have had knowledge of them, but also that he appreciated the danger and consciously assumed it. Gila Valley, G. & N. Ry. Co. v. Hall, supra; Cincinnati, N. O. & T. P. Ry. Co. v. Hall, 243 Fed. 78, 155, C. C. A. 606; Seaboard A. L. Ry. Co. v. Horton, supra; Chesapeake & O. Ry. Co. v. De Atley, 241 U. S. 310, 36 Sup. Ct. 564, 60 L. Ed. 1016; C. & N. W. Ry. Co. v. William Bower, 241 U. S. 470, 36 Sup. Ct. 624, 60 L. Ed. 1107.

In the case of Chesapeake & O. Ry. Co. v. De Atley, supra, the Supreme Court of the United States, in an opinion by Mr. Justice Pitney, said:

"According to our decisions, the settled rule is, not that it is the duty of an employe to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employe may assume that employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them."

In the case just referred to, the injured party was a brakeman, who had been sent ahead by the engineer of the train to a tower to ascertain the whereabouts of another train, and who went to the place designated, and there learned that his train had time to reach Maysville, Ky., about one mile distant. In descending to the platform in front of the tower, he saw his train coming, and although he was unable to accurately judge

its speed, it appeared to him to be moving slowly enough for him to board it. In attempting to get on, on account of the speed of the train and his own weight, he was thrown between the engine and the tender and his arm was severed. He had been in the employ of the company about six weeks, had made two trips over the road and had become familiar with his duties, and had frequently been called upon by the engineer to go forward to the signal towers for information and to mount the train as it came by. The train was running about 12 miles per hour on the occasion of the accident. With reference to the assumption of the risk, the court said:

"It is argued that, so far as the question of assumed risks is concerned, it makes no difference, in the case of a brakeman about to board a moving train, whether it is operated at a low or at a high rate of speed; that if the train is moving slowly the risk is an ordinary one incident to the business of railroading; while if it is moving rapidly the risk is open, obvious, and apparent. Were we to consider only extreme cases, such as were instanced in argument, the point might be conceded; that is, that mounting a train operated at 1 mile per hour is an ordinary risk, while mounting a train operated at 50 miles per hour presents a risk which, although extraordinary, is open, obvious and apparent. But these extremes do not present an apt illustration. A speed very much below 50 miles would endanger the brakeman's safety, at the same time being much less apparent. If those operating the train in question knew that plaintiff intended to board it at that point—and the verdict is to that effect—the jury was warranted in finding that plaintiff had a right to expect that the train would be moving at a moderate rate of speed such as would enable an ordinarily careful brakeman to get on with reasonable safety; and this upon the ground that as head brakeman plaintiff had the right—indeed, that it was his duty—to get upon the engine, since otherwise the train would be left without a head brakeman and the engineer without the information required for the safe operation of the train; and that plaintiff had no notice nor any opportunity to determine with reasonable certainty what the speed of the train was, or that it was too great for his safety, until the engine had practically reached him. It cannot be said, as matter of law, that a speed of 12 miles per hour would necessarily be obvious to him as a dangerous speed, before he made the attempt to board the train."

While the facts are entirely different from those in the instant case, we think the principle applicable is analogous, and the case under consideration is much stronger than the one alluded to. The argument made in the instant case is also similar; that is, that, a switch engine being more liable to turn over than a road engine, the derailment was one of the ordinary risks assumed by the deceased, and, on the other hand, the fact that the track was rough, uneven, and in need of repair, made the risk extrahazardous, but it was so open, obvious, and apparent that the deceased must be held, as a matter of law, to have appreciated the danger.

For the reasons stated, we conclude that the trial court could neither say from the evidence, as a matter of law, that the deceased knew the extent of the company's negligence and the resulting unusually dangerous conditions of the place where he was required to work, or that such dangerous conditions were so obvious that he was charged with such knowledge; nor if it be assumed, for the purposes of this case, that the deceased did know the extent of the company's negligence, could the court say, as a matter of law, that he fully appreciated the danger to him growing out of such negligence, and it is therefore clear that there was no error in overruling defendant's demurrer to plaintiff's evidence and in refusing to direct a verdict for the defendant company.

The remaining assignment of error is as follows:

"The district court erred in admitting, over the objection of the defendant, the testimony of witnesses upon the former trial of this case, same being read from case-made."

The particular testimony referred to is that of witnesses Barker and Huffman, who testified on the former trial of this case in the district court. The defendant bases its objection to this testimony solely on the ground that it was a condition precedent to the introduction of such evidence that it first be shown that the shorthand reporter's notes had been filed with the clerk of the court in which the cause was tried, as provided by section 1792, Rev. Laws of 1910, which reads as follows:

"The shorthand reporter in any court of record shall file his notes taken in any case with the clerk of the court in which the cause was tried. Any transcript of notes so filed, duly certified by the reporter of the court who took the evidence as correct, shall be admissible as evidence in all cases, of like force and effect as testimony taken in the cause by deposition, and subject to the same objection; a transcript of said notes may be incorporated into any bill of exceptions or case-made. On appeal it shall be the duty of the reporter to furnish such

transcript when demanded, as required by law. If any reporter ceases to be the official reporter of the court, and thereafter makes a transcript of the notes taken by him while acting as official reporter, he shall swear to the transcript as true and correct, and when so verified the transcript shall have the same force and effect as if certified while he was official reporter."

In Atchison, T. & S. F. Ry. Co. v. Baker, 37 Okla. 48, 130 Pac. 577, L. R. A. 1915A, 1186, Ann. Cas. 1915B, 714, it was held by this court, in an opinion by Commissioner Brewer, that the testimony of witnesses adduced at the former trial between the same parties involving the same subject-matter, which had been taken down and transcribed by the official reporter and preserved by bill of exception on appeal, was admissible, if otherwise unobjectionable, in the second trial of the same cause, where the witnesses resided in another state and were not present at the second trial. Although we consider this case sufficient authority for the introduction of the testimony in the instant case, if we assume, without deciding, that a shorthand reporter's transcript of his notes is not entitled to admission in evidence by virtue of the provisions of section 1792, supra, unless the reporter's notes have first been filed with the clerk of the court in which the case was tried, we are of the opinion that the testimony was competent under other provisions of the Code. Section 5242, Rev. Laws of 1910, provides, in effect, that after the case-made shall have been settled by the trial judge it shall be attested by the clerk of the court, and the seal of the court should be attached thereto, and that it shall then be filed with the papers in the case. It thus becomes a part of the record in the case, and section 5115, Rev. Laws of 1910, provides that—

"The books and records required by law to be kept by any county judge, county clerk, county treasurer, register of deeds, clerk of the district court, justice of the peace police judge or other public officers, may be received in evidence in any court. * * *"

The preliminary proof of the introduction of the testimony of these witnesses shows that the court reporter had transcribed his shorthand notes, had certified to the same, and that said transcript of the testimony was incorporated in the case-made, which was settled by the trial judge and filed in the district court, and no question being raised as to the necessary facts having been shown to make the testimony competent as the depositions of the witnesses, and no objection other than the one above stated having been made thereto, the court did not err in overruling the objection made to its introduction.

Finding no reversible error in the record, the judgment is affirmed.

HARDY, C. J., and HARRISON, PITCHFORD, and JOHNSON, JJ., concur.